D. A. MINOR, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

1. Evidence on the part of the State tending to show that the accused by compulsion procured one of the State witnesses to sign an alleged affidavit for the purpose of suppressing evidence against himself, is competent; and the testimony of the notary public who signed the alleged affidavit is competent to show that the State witness did appear before him and did not sign the alleged affidavit in his presence and that the same was written and signed by the notary in the absence of the witness, and taken in that condition from the notary's office.

2. A certain box or case was offered in evidence by the State, for the purpose of connecting the accused with the alleged larency, and a State witness, in order to identify the box, was asked this question: "Does it look like it?" The witness answered, "yes, to the best of my knowledge, it is the case that I received at the time." Held, that this answer of the witness was competent testimony, its value being a question for the jury.

3. Instructions requested by the accused which treat the evidence on the part of the State as circumstantial alone, are properly refused, when portions of the State's testimony are of a positive character.

4. The evidence is sufficient to sustain the verdict.

This case was decided by the Court *En Banc*.

Writ of Error to the Criminal Court of Record for Duval County.

The facts in the case are stated in the opinion of the court.

*Jno. E. Hartridge* and *F. W. Pope*, for plaintiff in error.

*W. H. Ellis*, Attorney General, for the state.

HOCKER, J.—At the April term, 1907, of the criminal court of record of Duval county, D. A. Minor, the plaintiff in error, was convicted of the larceny of certain pieces of silk from the J. D. Horn Company, a corporation, and sentenced to the state prison for one year. He seeks here to reverse this judgment and sentence.

The first assignment of error is based on the action of the court in permitting Paul E. Peck, a notary public, in response to questions of the prosecuting officer to answer the following questions after two papers purporting to be affidavits—one the affidavit of Ed. Harris, had been handed to the witness: 1st. Did you ever see those papers before? And, did Ed. Harris appear before you in person and acknowledge that paper before you?" The alleged affidavit of Ed. Harris is as follows:

"STATE OF FLORIDA,

COUNTY OF DUVAL.

Before me, a notary public in and for said state and county, personally came Ed. Harris who first being duly sworn deposes and says that he was employed by the J. D. Horn Company in January, 1907, and as their employe on Jan. 24th, 1907, he personally checked and packed the following goods: three pieces plaid 36-in. silk, 2 pieces taf. 36-in. silk, 1 piece P. D. S. 36-in. silk, 1 piece P. D. S. 36-in. silk and 1 piece taf. 36-in. silk for shipment to Gresham Importing & Commission Co., Griffin, Ga., and that these goods were in the case when shipped.

ED. HARRIS.

Sworn to and subscribed before me this 5th day of March, 1907.

P. E. PECK,

Notary Public State of Florida. My commission expires June 9, 1907."

Ed. Harris was a witness for the state. At the time of the alleged larceny he was a packer and general por-

ter for the J. D. Horn Company. On his cross-examination he was asked if he did not sign an affidavit before Mr. Peck, which was offered to the witness for identification. He denied signing this affidavit before Mr. Peck, but admitted he signed it before the accused, Minor, and at his instance; that he had to make it; that Minor was angry, and said "by God, it seemed like I wanted to expose the business anyhow, and I signed the paper." Afterwards, Mr. Bryan, the attorney for the state, introduced Mr. Peck as a witness, stating that he was introduced for the purpose of corroborating Ed. Harris. It is stated in the bill of exceptions that when Ed. Harris was being cross-examined as to the affidavit the attorney for the accused had called on the prosecuting officer for the affidavit, and the latter handed the affidavit to the attorney stating he could offer it in evidence. It was shown Ed. Harris for identification, and although several questions were asked Harris in regard to it, it was not then offered in evidence. In this state of the testimony the questions were asked which were permitted and assigned as error. It is contended that a notary public cannot be heard to contradict his own notarial certificate. Whatever sanctity may be attached to a notary's certificate, where one is authorized by law to be made, we know of no authority which attaches sanctity to an alleged extra-judicial affidavit such as the one we are considering. Collins v. State, 33 Fla. 446, 15 South. Rep. 220. It appears from the evidence of Harris brought out by the accused, which is uncontradicted, that his signature to it was obtained by Minor under some sort of compulsion for the purpose of shutting him up as a witness to Minor's connection with the taking of the goods of the J. D. Horn Company. Minor was endeavoring to suppress the evidence against himself, and we think it was perfectly competent for the State to bring out the facts bearing on his conduct in this con-

nection.    Peck was examined and corroborated Harris-
to the effect that latter had not signed the affidavit before
the former.    Peck explains how Minor got the affidavit
out of his possession before Harris had signed it.    The
court committed no error in this connection.

The second assignment of error is based on the re-
fusal of the court to strike out the testimony of Peck and
the affidavits of Harris and that of D. A. Minor and
John A. DaCosta.    Mr. Peck had testified that neither
Harris or DaCosta had signed the affidavits before him.
He says that they were drawn on information furnished
by Minor, and that after they were drawn he signed
and sealed them and that Minor took them off promising
to bring the parties before him before they were taken
out of his office, but never did it.    This transaction
tended to show that Minor was endeavoring to shut off
the testimony of Harris and DaCosta connecting him
with the alleged crime, and was competent.

The third assignment is based on the refusal of the
court to strike the answer of a state witness, John
O'Neill, to the following question:    "Does it look like
it?"    The answer being, "Yes, to the best of my knowl-
edge, it is the case that I received at the time."    So far
as we can gather from the evidence the *case* referred to
was either a box which was exhibited to the jury in
which the silks alleged to have been stolen were packed
at the store of J. D. Horn Company to be reshipped to
the party in Georgia from whom it had been received, or
another box or case in which Minor caused Harris to
place Irish potatoes and sacks hereafter referred to.    Mr.
Horn, the president of the company, had directed that
the silk be returned.    It seems to have been packed in
a box or case for that purpose, and after it was packed
the evidence tends to show it was taken out by the ac-
cused and the box filled with Irish potatoes and old sacks
and reshipped by him to the party in Georgia as con-

taining silk. The object of the question was to identify the box, for which O'Neill as railroad agent, had receipted as containing silk. Granting that the witness could not swear positively to the identity of the box or case, we know of no rule of law which makes the opinion of the witness inadmissible. It was at least pertinent and relevant, and the value of his opinion was a question for the jury. Dupuis v. Thompson, 16 Fla. 69, text 73. See, also, Jordan v. State, 50 Fla. 94, 39 South. Rep. 155; Alford v. State, 47 Fla. 1, 36 South. Rep. 436.

Assignments from the fourth to the eighth inclusive are based on the refusal of the trial judge to give certain instructions requested by the defendant, based on the theory that the defendant, Minor, at the time of the alleged larceny, was the general manager of the J. D. Horn store and as such had charge and possession of the silks in question, and that in taking them he committed no trespass, and, therefore, was not guilty of larceny. If the offense was embezzlement, it is contended there should have been no conviction of larceny. This contention requires a close examination of the evidence and the law applicable thereto. The evidence shows that in January, 1907, when the alleged larceny was committed, the accused, Minor, was in the employment of the J. D. Horn Company as manager of their mercantile establishment in Jacksonville. According to the testimony of J. D. Horn, the president, he had general supervision of the business, keeping the stocks up, looking after the sales people, advertising and such duties as would naturally come under the head of the management of a business of that kind. The president, Mr. Horn, had general supervision of the whole business. Minor had not been given authority to sell goods himself, or pack them up. He had authority to fix prices for the sales people who did the selling and packing. As to Minor's relation to the silk in question the evi-

6

dence of Mr. Horn is that H. C. Jones was an employe of the company, and had charge of the silk and dress goods department. The silks when received were checked by Jones. Mr. Horn saw and examined them in Jones' department, and did not like them. He ordered Mr. Jones to return them to the shipper. No clerk was authorized by Horn to sell them. H. C. Jones testified that he bought the silks from the Gresham Importing and Commission Company from samples. He says he was instructed by Mr. Horn to return them to the sender as they were of inferior quality. Mr. Jones turned them over to John DaCosta, who was the shipping clerk. John DaCosta testified he was the shipping clerk; that Jones brought the silk to him and that Minor told him to have the silk packed up and ready, and he (Minor) would give him (DaCosta) orders where to ship it. DaCosta says he packed it up Saturday afternoon in a dry goods' box and Ed. Harris helped him. The silks were thus on Saturday afternoon segregated from the stock of goods, packed up with special orders from Mr. Horn that they be returned to the company from which they had been received. Ed. Harris testified that the silks were packed up on Saturday afternoon and placed on the elevator, and that on Monday or Tuesday Minor told him he was not going to ship the silks, and directed him to buy a half dollar's worth of Irish potatoes and to get some bags and bring them into the warehouse and required him to make a box to ship them in, saying he was going to send that box where the silk was to go. Minor put the Irish potatoes and old sacks in the box. It was left there that day and he did not see it any more until he identified it in the court room. Ed. Harris, by Minor's direction, carried the box containing the silk to the business place of a Mr. Aftermore on the day before the box containing the potatoes, sacks, etc., was nailed up. David Aftermore tes-

tified that he was a dealer in ladies' ready-made clothes and his place of business was 617 West Bay Street, Jacksonville; that he knew the accused, D. A. Minor; that in January, 1907, he had some dealing with Minor in reference to some silk. Minor asked him if he would like to have some silk, and he told Minor if his goods were such that he could use them for manufacturing he might buy them, if the price was cheap enough. Minor sent the silks to him in a box. He examined them, and they did not suit him. He called Minor up and told him to send for them. Minor sent two trunks the next day which were locked, and then sent the same colored man that brought the goods with the keys, who said he would call for the trunks in half an hour, which he did. He drove with them towards the depot. Ed. Harris carried the trunks to the depot, under orders from Minor, and had them checked and brought the checks back and delivered them to Minor. They were claim-checks. He also delivered the keys of the trunk to Minor. Ed. Harris got a drayman to carry the trunks to the depot. What became of the trunks and their contents is not shown by the record. They disappear from the scene. The accused introduced no testimony. Do the foregoing undisputed facts show a case of larceny, or embezzlement, or of either larceny or embezzlement?

"It is contended that the information in this case should have been based on Section 3311, General Statutes of 1906. It reads as follows:"

"3311. (2457.) Embezzlement by officer, clerk, agent, servant or member of company or society.—If any officer, agent, clerk, servant or member of any incorporated company, or if any officer, clerk, servant, agent or member of any co-partnership, society or voluntary association, or if any clerk, agent or servant of any person, embezzles or fraudulently disposes of, or converts to his own use, or takes or secretes with intent

so to do anything of value which has been entrusted to him, or has come into his possession, care, custody or control by reason of his office, employment or membership, he shall be punished as if he had been convicted of larceny."

In 2 Bishop's New Crim. Law, §328, it is said: "According to a doctrine brought to view in our first volume, (see, also, Bishop on Statutory Crimes (3rd ed.) §§160-164), if embezzlement is a misdemeanor while larceny is felony, the same evil act cannot be both; that is, if it is made embezzlement by the statute, as interpreted by the courts, it cannot thereafter be a larceny, whatever it was before; or if it is still a larceny, it cannot also be embezzlement. But where both crimes are of the same grade, it accords with established principles to hold that if an act is sufficiently covered by the terms of the statute, it it is embezzlement, while still if before the statute came it was larceny, it remains such, and it may be indicted as the one or the other at the election of the prosecutor." A statute which is supplementary to the common law does not displace that law any further than is clearly necessary. The statute is in general considered as mere cumulative unless the rights or remedies which it creates are expressly made exclusive, or unless the statute is inconsistent with the common law. Black on Interpretation of Laws, 234, 235; 1 Kent's Com. (13th ed.) bottom pp. 551, 552. In Rex v. Carlile, 3 B. & A. 161, (5 E. C. L. 249). Abbott, C. J., in the course of his opinion says: "And the rule laid down by Lord Mansfield in Rex. v. Robinson, Burr, 799, is this, that where a statute creates a new offense by prohibiting and making unlawful anything which was lawful before, and appoints a specific remedy against such new offense (not antecedently unlawful) by a particular sanction and particular method of proceeding, that particular method of proceeding must be pursued, and no

other. But where the offense was antecedently punishable by a common law proceeding, and a statute prescribes a particular remedy by a summary proceeding, there either method may be pursued, and the prosecutor is at liberty to proceed either at common law or in the method prescribed by the statute; because there the sanction is cumulative, and does not exclude the common law punishment. * * *. If a statute makes that felony which was a misdemeanor at the common law, we know that the misdemeanor is merged in the felony; and it cannot be proceeded upon as a misdemeanor afterwards; but I believe many instances will be found in which prosecutions at the common law are constantly carried on against certain offenses, although there are statutes enacting particular punishments for those offenses, and providing that a particular course of proceeding shall be adopted, in order to bring them within their operations. I take the principle to be perfectly clear, and to have been long established."

BAILEY, J., in commenting on Rex. v. Robinson, among other things, said: "If however, the class and character of an offense be varied; as for instance, if from a misdemeanor, it be made a felony, the case is widely different." BEST, J., said: "It has long been a settled maxim that neither the provisions of the common law or statute law are abrogated but by the express words of an act of parliament, or by subsequent enactments so inconsistent with the previous law as to raise a necessary implication that the legislature intended it should be altered."

In 2 Bishop's New Crim. Law. §329, it is said that in some cases these distinctions have been overlooked. In larceny it is essential that there should be a trespass to constitute the offense, and it was to meet cases in which clerks and servants converted property to their own use, which came into their possession by virtue of

their employment from other persons than their employers, and which cases were not regarded as larceny that the original statutes creating the offense of embezzlement were passed. Id. §§318, 365. Such statutes were for the protection of employers against the frauds of those in whom they confided, and where no confidence is reposed and none is violated, the offense is not committed. Id. §352. To illustrate: While if the thing embezzled came into the servant's hands in the ordinary course of his duty or out of the ordinary course, it came in pursuance of a special direction from the master to receive it, the case may be within the statutes, yet if he took it without specific authority, and also the taking was not in the line of his service, the result is otherwise." Id. §353. Our statute, however, is very much broader in its terms than the English statutes commented upon by Bishop, and embraces the embezzling of any property with which the agent, clerk or servant has been "entrusted," or which has come into his *"possession, care, custody or control* by reason of his employment." Courts, in construing these statutes, distinguish between the *custody* and possession of property by a clerk, servant or agent. A clerk, servant or agent who appropriates property of which he simply had the custody, as distinguished from the possession, is guilty of larceny at common law, while if he had *possession,* as distinguished from the possession of the master, he is guilty of embezzlement.  2 Russell on Crimes (9th ed.) pp. 192, 193, 194; 15 Cyc. 493, and cases cited in note 12.

In Commonwealth v. Berry, 99 Mass. 428, S. C. 96 Am. Dec. 767, it is held: "If the goods of a master fraudulently appropriated by his servant, were at the time of such appropriation, in the actual or constructive possession of the master although in the custody of the servant, the crime is larceny;" and in the opinion it is said: "The distinction is between *custody* and posses-

sion. A servant who receives from his master goods or. money to use for a specific purpose has the *custody* of them, but the possession remains in the master." 4 Blackstone's Com. (Hammond) p. 292. See, also, note in State v. Homes, 57 Am. Dec. 284; Commonwealth v. Ryan, 155 Mass. 523, 30 N. E. Rep. 364; Powell v. State, 34 Ark. 693; Walker v. Commonwealth, 8 Leigh (Va.) 743; Coblitz v. State, 36 Tex. 353. Our statute defining embezzlement covers several acts on the part of servants, agents and clerks which were larceny at common law, as for instance where property is fraudulently appropriated by a clerk, servant or agent which may be in his custody, as distinguished from his possession. As to such cases the writer thinks the principle laid down by Bishop, and heretofore quoted, should be applied, *viz*: that the prosecutor should be allowed to elect whether he will prosecute for larceny or embezzlement, as the punishment for both offenses is the same. The principle, I think, is sound, and moreover it is the only way to meet such cases in the appellate court, when the contention is made that one convicted of larceny should have been convicted of embezzlement, and vice versa. See opinion of Justice Holmes in Commonwealth v. Ryan, *supra*.

While the majority of the court do not dissent from this view, they are of the opinion that it is not necessary at this time under the facts of this case to decide it, because they think that the proofs show that the defendant, Minor, was not in contemplation of law either in the *custody* or *possession* of the goods in such sort as to make his clandestine appropriation thereof to his own use embezzlement under our statutes, but nothing more than larceny. The majority of the court are of opinion that the proofs show that J. D. Horn, the president of the corporate owner of the goods, was there in personal charge of the store and in the legal *custody* and

*possession* of all the goods contained therein. And that the defendant, Minor, though general executive manager of the business, was nothing more than an employe under him; and that the proofs further show that the particular goods in question in this case were not either actually or constructively in the defendant's *custody* or *possession,* but were placed by the president of the corporate owner in the personal custody and possession of another employe to be packed and shipped. That while the defendant, Minor, as general executive manager had at all times full *access* to all the goods in the store, yet that such *access* to them did not constitute him in law either the *custodian* or *possessor* of these goods. For these reasons, in which the writer of this opinion does not fully concur, the majority of the court are of the opinion that the charge of larceny was properly made out. It follows that the court did not err in refusing instructions based on the theory that the case was one of embezzlement, and not larceny. The remaining assignments, except the last, are based on the refusal of court to give instructions to the effect that the evidence was circumstantial alone. Much of the evidence was of the most positive character, especially portions of the testimony of Ed. Harris, and, therefore, the instructions requested were inappropriate.

The last assignment is that the court erred in overruling defendant's motion for a new trial. The only contention raised under this assignment which has not been considered is that the verdict was contrary to the evidence, and in this connection it is urged that there is no identification of the silks in the trunks (alluding doubtless to the trunks in which Aftermore put the silks at Minor's request) with the silk that Minor was directed to return to the shipper. We have been unable to find in the record any evidence that Minor was ever directed to return the silks to the shipper. Mr. Horn, the

president of the company, directed Jones to return them, but it does not appear that he ever directed Minor. Jones delivered them to the shipping clerk, DaCosta, and DaCosta and Ed. Harris packed them in a box. Granting, however, that Minor was specially directed to return the goods to the shipper, he could only have had a special custody of them for that purpose, and under the rule we have laid down, his fraudulently appropriating them would be larceny, for the possession was not in Minor, but the owner, which was the corporation. After these silks were packed in the box by Ed Harris and DaCosta, the box containing them was sent by Minor to Aftermore for the purpose of being sold to Aftermore. Aftermore is somewhat hazy in his description of the silk, but there is no doubt that the box when he received it contained silk, and there is nothing to raise any presumption that it was not the same silk put into the box by DaCosta and Ed. Harris. There is no doubt that the silk sent by Minor in the box to Aftermore was, when rejected, placed by him into two trunks which Minor had sent Aftermore for the purpose, and that these trunks were taken to the depot by Minor's direction, and checks for them obtained by Minor. We think this evidence sufficiently connects Minor with the larceny of the silks which were placed in the box to be returned to the shipper, and that the evidence as a whole sustains the verdict.

The judgment of the court below is affirmed.

All concur.